**No. 27764**

**The People of the State of Colorado v. Albert J. Rosenberg; John R. Burke**

(572 P.2d 1211)

Decided January 3, 1978.

J. D. MacFarlane, Attorney General, David W. Robbins, Deputy, Edward G. Donovan, Solicitor General, J. Stephen Phillips, Chief, Criminal Appeals Appellate Section, for plaintiff-appellee.

Brenman, Sobol, Baum, Zerobnick, Epstein; Zuckerman & Lutz, P.C., Leo T. Zuckerman, Moshe Luber, for defendants-appellants.

*En Banc.*

MR. JUSTICE ERICKSON delivered the opinion of the Court.

In a trial to the court, Albert J. Rosenberg and John R. Burke were convicted of criminal extortion, section 18-3-207, C.R.S. 1973 (1976 Supp.), and conspiracy to commit criminal extortion, section 18-2-201, C.R.S. 1973 (1976 Supp.), and seek reversal and dismissal on appeal. We affirm.

Rosenberg was known by the nickname of "Casey" and operated a Denver bar and restaurant known as Casey's Palace. Burke was a bartender at Casey's Palace. Dean Vanek participated in a blackjack game at Casey's Palace and issued a series of checks to cover his losses. The charges against Rosenberg and Burke were filed after Vanek stopped payment on the checks and threats were made in an attempt to collect the amounts evidenced by the checks.

Vanek, over a period of several months, entered into various gaming transactions at Casey's Palace and lost between three and four thousand dollars. While playing blackjack on the night of February 6, 1976, he lost approximately $800. To cover his losses, he issued personal checks — two of which were in the amounts of $100 and $220. The record shows that the practice at Casey's Palace was to have the checks issued in blank so that the checks could be negotiated among the players. However, before Vanek left at 8:30 on the morning of February 7, Casey Rosenberg's wife cashed the check for $220, and Vanek paid his gambling debts. When Vanek left Casey's Palace, he was told that the games were fixed. He thereafter caused a stop-payment order to be issued on the checks which he had written in the course of a night of gambling.

Rosenberg's wife cashed the $220 check at Majestic Savings & Loan where she maintained a trust account for her child. Vanek, by coincidence, was an employee of Majestic Savings & Loan. As a result of the stop-payment order, Casey's wife's account was debited $220, representing the check on which Vanek had stopped payment. Payment was also stopped on the $100 check which was cashed by another employee of Casey's Palace.

When Rosenberg learned of the stop-payment order, both he and Burke went to see Vanek's superior on February 20. They indicated at the meeting that if the checks were not honored there might be trouble both for Vanek and the bank. On the same day, Rosenberg telephoned Vanek and told him that if he didn't make good on the checks he would never have to worry about anything for the rest of his life. On the following Monday, Burke appeared at Vanek's office to discuss the bad checks. He told Vanek that "Casey is making arrangements with Geno to collect a debt. This is real bad. Geno is an animal. The only way to stop Geno is with a gun." At the same time, Burke obtained Vanek's home address

from a temporary permit that was on Vanek's automobile and gave the address to Rosenberg.

As a result of the visits, Vanek contacted the Organized Crime Task Force of the Colorado Bureau of Investigation (CBI) on February 23. Thereafter, a series of telephone conversations between Rosenberg and Vanek were recorded by agents of the CBI. During the trial, the telephone calls which were recorded and transcribed were admitted into evidence. The tenor of the calls was that if Vanek did not pay the money represented by the checks, he would have to answer to Geno, who was a strong-arm collector.

On March 5, 1976, Rosenberg and Richard M. Haverly went to Vanek's apartment. They saw Vanek in the apartment and pounded on the door, threatening to break it down if Vanek did not answer. Their actions were of such a nature that a neighbor summoned the police, and both Rosenberg and Haverly were arrested. Haverly was tried with the appellants and was convicted of extortion and is not before us on appeal.

## I.

The appellants first challenge the constitutionality of the criminal extortion statute on the grounds that it is overbroad and vague. Section 18-3-207, C.R.S. 1973 (1976 Supp.), provides:

"*Criminal extortion.* Whoever without legal authority threatens to confine, restrain, or cause economic or bodily harm to the threatened person or another or to damage the property, economic well-being, or reputation of the threatened person or another with intent thereby to induce the threatened person or another against his will to do an act or refrain from doing a lawful act commits criminal extortion which is a class 4 felony."

Both the overbreadth and vagueness arguments are directed by the appellants at the statutory provision which proscribes threats to damage the "economic well-being" of another person. No contention is made that the provision concerning threats of bodily injury is unconstitutional. Therefore, the appellants lack standing to raise the constitutional issues which involve statutory provisions which are not properly before us for interpretation. Conviction under a portion of a penal statute which is constitutional does not bestow standing to challenge other portions of the statute. The appellants were convicted of threatening to cause bodily harm; not economic harm. Moreover, the appellants were not affected by the statutory provisions which they now question. *People v. Sharpe*, 183 Colo. 64, 514 P.2d 1138 (1973); *Garcia v. City of Pueblo*, 176 Colo. 96, 489 P.2d 200 (1971).

## II.

The second argument made by the appellants is that the criminal extortion statute is not applicable to efforts to collect a legally enforceable debt. We disagree.

■ Our criminal extortion statute is clearly directed against the means used and the purpose sought to be accomplished by threats. If the checks in this case were subject to collection as valid negotiable instruments,[1] the threats of bodily harm would still bring the appellants' actions within the ambit of the statute. The Washington Supreme Court analyzed that state's extortion statute in *State v. Richards*, 97 Wash. 587, 167 P. 47 (1917), and said:

"[O]ne can commit this crime, though he is of the opinion that the money thus sought is actually due him. The law does not countenance forceful and unlawful collection even of just debts, and when one uses the methods set forth in this statute to obtain money or property, he commits the crime defined in the statute, irrespective of his belief that in so doing he is only attempting to obtain that which he is entitled to receive. . . ."

The quotation is applicable to this case. Lawful means exist to enforce the collection of debts. If the appellants honestly believed they were entitled to payment for the obligations evidenced by Vanek's checks, they should have availed themselves of appropriate civil remedies.

### III.

■ The final allegation of error concerns the sufficiency of the evidence that supports the appellants' convictions. When the sufficiency of the evidence is challenged on appeal, we review the evidence in the light most favorable to the prosecution and will not set aside a conviction because a different conclusion might be drawn from the evidence. Our task is to determine whether sufficient evidence exists to reasonably support the conclusion that the appellants are guilty beyond a reasonable doubt. *People v. Bueno*, 188 Colo. 396, 534 P.2d 1196 (1975); *People v. Marques*, 184 Colo. 262, 520 P.2d 113 (1974); *People v. Bennett*, 183 Colo. 125, 515 P.2d 466 (1973); *People v. Vigil*, 180 Colo. 104, 502 P.2d 418 (1972).

■ The evidence is sufficient to support the trial court's determination that the appellants were guilty beyond a reasonable doubt.

Accordingly, the judgment is affirmed.

[1]We express no opinion as to whether Vanek's checks represented legally enforceable debts.